UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Siamak Namazi | : | |
| | : | |
| and | : | |
| | : | |
| Mohammed Baquer Namazi | : | |
| | : | Civil Action No. 24-cv-3506 |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| THE ISLAMIC REPUBLIC OF IRAN | : | |
| Abbas Araghchi, Minister of Foreign | : | |
| Affairs | : | |
| Ministry of Foreign Affairs | : | |
| Khomeini Avenue | : | |
| United Nations Street | : | |
| Tehran, Iran | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## COMPLAINT

1.     This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff for their own benefit, and/or for the benefit and on behalf of all those legally entitled to assert a claim under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c). Plaintiffs, by counsel, respectfully bring this action against Defendant, Islamic Republic of Iran ("Iran" or "Iranian Regime"), for severe personal injuries and other irreparable harm, which the Plaintiffs have suffered as a result of the Defendant's hostage taking, torture, personal injury and related torts.

## JURISDICTION, VENUE, AND CHOICE OF LAW

2.     This Court exercises subject matter jurisdiction in accordance with the provisions

1

of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

3.      Iran has been designated as a State Sponsor of Terrorism by the United States Department of State since 1984 and continues to have been so designated to the present day.

4.      Iran is subject to suit in the courts of the United States pursuant to 28 U.S.C. § 1605A ("FSIA").

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign State may be brought in the United States District Court for the District of Columbia.

6.      Actions for hostage taking, torture, personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents within the meaning of 28 U.S.C. § 1605A(c) are unique causes of actions arising out of federal counterterrorism statute(s) and are controlled by applicable federal law.

## THE PARTIES

### A.  The Plaintiffs

7.      Plaintiff Siamak Namazi ("Siamak") was and, at all times relevant hereto, is a citizen of the United States.  Siamak, an Iranian American business executive, was previously a fellow with the Woodrow Wilson International Center for Scholars and National Endowment for Democracy. He was also a Young Global Leader of the World Economic Forum. Siamak traveled to Iran on multiple occasions to visit his parents who lived there.

8.      On July 18, 2015, following a four-day visit to Tehran to attend a funeral and see his parents, Siamak had his passports confiscated, was detained for a short period of time, and was compelled over several months to participate regular interrogations by agents of the Islamic Revolutionary Guard Corps ("IRGC"). On October 13, 2015, he was detained, arrested, taken

hostage and caused to be imprisoned on false charges by the Defendant. In a bogus trial, which lacked all due process, Siamak was "tried" and convicted in Iran's Revolutionary Court. He was convicted of Collaboration with Hostile State, with reference to the United States, and sentenced to ten years of imprisonment. He spent more than eight years in Iran's notoriously brutal Evin Prison and was under Iranian custody as a hostage, used by Iran to extort the United States for political gains.  During his wrongful imprisonment, Siamak was tortured and mistreated in numerous respects.  At the time of the acts alleged, and at all other times relevant hereto, Siamak was a victim of "torture" as defined in the TVPA and "personal injury . . . caused by an act of torture," as required by 28 U.S.C. § 1605A.

9.      Plaintiff Mohammed Baquer Namazi ("Baquer") was and, at all times relevant hereto, is a citizen of the United States.  On February 22, 2016, Baquer, just like Siamak, was arrested, taken hostage and caused to be imprisoned on false charges by the Defendant. He was also convicted of Collaboration with Hostile State and sentenced to ten years of imprisonment. He was held in Iranian custody for more than six years as a hostage, used by Iran to extort the United States for political gains. During his wrongful imprisonment, Baquer was tortured and mistreated in numerous respects.  At the time of the acts alleged, and at all other times relevant hereto, Baquer was a victim of "torture" as defined in the TVPA and "personal injury . . . caused by an act of torture," as required by 28 U.S.C. § 1605A.

## B.  The Defendant

## The Islamic Republic of Iran

10.      Defendant Islamic Republic of Iran is a foreign state that has been designated and continues to remain designated by the United States of America federal government as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979 (50 U.S.C. App.

§ 2405) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at all times since January 19, 1984.

11.    The Islamic Republic of Iran, and its instrumentalities, including, but not limited to, the Iranian Ministry of Intelligence ("MOIS") and IRGC, through its actions, caused and is fully liable and responsible for the injuries described herein, within the meaning of 28 U.S.C. § 1605A.

## Facts

12.    Siamak Namazi is a 53-year-old Iranian-American dual national. Born in Iran, Siamak was naturalized and became an American citizen in 1993. After graduating from Tufts University, Siamak returned to Iran and worked as a duty officer with the Ministry of Housing and Urban Planning in Tehran from 1994 to 1996, as part of his compulsory national service, after which he returned to school in the United States and received a master's degree in Urban Planning and Regional Development from Rutgers University. While completing this program he joined Cipher Systems, a knowledge management consultancy based out of Annapolis. Siamak returned to Iran in 1999 and worked as a director and then managing director of Atieh Bahar Consulting, at a family consulting firm founded in Tehran. In 2005 and 2006 he went on to hold fellowships at the Woodrow Wilson International Center for Scholars and the National Endowment for Democracy in Washington, D.C. He was recognized by the World Economic Forum as a Young Global Leader in 2007.

13.    After a short return to Iran, Siamak resigned from Atieh Bahar Consulting and moved to the United Arab Emirates in 2007, where his work no longer related to Iran. He initially took up a position in the energy team of a Hong Kong-based commodity trading firm called The Noble Group, and later took on the role of General Manager of a boutique energy consultancy that

focused on the studying the natural gas balance in the region. In 2011, Siamak earned a second master's degree, this one from London Business School. From 2013 he resumed travelling to Iran for short, family visits over long weekends.

14.    At the time of his arrest, he was working as Head of Strategic Planning at Crescent Petroleum Company in Dubai. In this position, Siamak was focused on the company's strategic outlook as well as major items such as the sustainability report and did not have any responsibilities specific to Iran. He was never engaged in politics. In July 2015, he traveled from Dubai to Tehran for a four-day visit to attend a family funeral.

15.    Mohammed Baquer Namazi was formerly governor of the Iranian province of Khuzestan under the Shah, prior to the Islamic Revolution. In 1978, one year prior to the Islamic Revolution, Baquer resigned from the government and continued to live in Iran with his wife Effie for several years. Facing mounting pressures, Baquer sent his wife Effie Namazi and their sons Babak Namazi and Siamak Namazi from the country in 1983. Later that year, Baquer fled the country through Pakistan. Ultimately the family reunited and settled in the United States, where he was naturalized and became a citizen. He dedicated the rest of his career to the eradication of poverty, with a special focus on children.

16.    From 1984 to 1997, he served as a UNICEF policy advisor and worked in countries such as Kenya, Somalia, and Egypt, focusing on vulnerable people and aid toward women and children affected by war.

**The Beginning of the Politically Motivated Targeting of Siamak Namazi**

17.    In 2007, Siamak Namazi was politically targeted and frequently interrogated by the Iranian Ministry of Intelligence related to his previous affiliations to two U.S.-based organizations: the Woodrow Wilson International Center for Scholars (Wilson Center), where he was a Public

Policy Fellow from July-October 2005; and the National Endowment for Democracy, where he was a Reagan-Fascell Fellow from November 2005-March 2006.

18.    Despite the fact that Siamak wasn't actually an employee of either of these organizations, the intelligence officers interrogating him in Iran repeatedly and baselessly accused of espionage and collaboration with a foreign state.

19.    Siamak but was eventually cleared of these charges and no formal prosecution was made against him.

20.    Despite having being cleared of any wrongdoing in 2007 and moving to Dubai, it was on the basis of these unfounded allegations that charges would again be brought against Siamak over a decade later on the basis of his affiliations with these highly reputable organizations – this time by the intelligence arm of the Islamic Revolutionary Guards Corps (IRGC).

**The 2015 Arrest of Siamak Namazi**

21.    On July 18, 2015, Siamak Namazi was intercepted upon clearing the entry checkpoint into Tehran's airport by plainclothes individuals purporting to be with the IRGC. He intended to travel back to the United Arab Emirates, where he was living, after a long-weekend visit in Tehran, where he attended the funeral, visited aunts and uncles, and spent a night at a friend's garden.

22.    Before he could reach the first passport control checkpoint, IRGC guards dressed in civilian clothes surrounded him. They told Siamak they were from the IRGC and instructed him to accompany them for questioning. The guards momentarily showed Siamak a document that they claimed to be an "exit ban", but these were not official documents. In the few seconds that Siamak was able to read the document, he only understood that there was no arrest warrant issued for him.

23.    The IRGC guards escorted Siamak to a parked car in the airport parking lot and

forced him into the backseat. From there, the IRGC guards questioned Siamak for several hours about his affiliation with the World Economic Forum's Young Global Leader program and informed him that his exit ban was due to his affiliation with this group, which they alleged was an arm of the "hostile US government," despite the fact that the Forum is a Swiss-based non-governmental entity. All of his electronic devices, including his laptop, tablet, and mobile devices were immediately confiscated and searched, and the IRGC officials demanded all of his passwords. The IRGC also seized Siamak's U.S. and Iranian passports. When the IRGC guards were through with their questioning, they then told Siamak they would "keep in touch" and instructed him not to leave Tehran. They gave Siamak a handwritten receipt of the confiscated items.

24.    It is noteworthy that this incident took place just four days after the finalization of the Joint Comprehensive Plan of Action ("JCPOA"), which occurred on July 14, 2015. The international media was touting this nuclear deal as a high point in U.S.-Iran relations since 1979. Iranian and U.S. officials were meeting openly, and global media highlighted Iran as a promising travel destination.

25.    For the following three months, while still living with his parents at their apartment, Siamak Namazi was regularly interrogated by the IRGC. He would receive an anonymous phone call, simply instructing him on a time and to present himself at an unmarked building where the IRGC uses to conduct such illegal interrogations. The time and frequency of interrogations was unpredictable.

26.    At first, interrogations happened nearly every day, then maybe only two to three times a week. Sometimes, several days would pass without an interrogation.

27.    The interrogations were completely private meetings at an unmarked location – only Siamak and IRGC guards were present. The primary focus of the questions was Siamak's

association with the government of the United States. For example, the IRGC guards would ask about his work with Washington think tanks like the Wilson Center, and his membership with associations like the World Economic Forum's Young Global Leaders program.

28.    The IRGC accused Siamak of being a spy for the U.S. and would repeatedly tell him to "prove your innocence" and "admit it."

29.    On several occasions the IRGC would stage an arrest scene to scare Siamak. While he was being questioned, they would arrange for screeching tire sounds outside and would tell Siamak, "They have come to take you to prison."

30.    On one occasion in August 2015, instead of being summoned to the unmarked location, Siamak was told to come to see the magistrate at Evin Prison.

31.    Siamak's brother and lawyer[1] accompanied him to the prison, however neither was allowed in with the magistrate. After some time had passed and they had not heard anything from Siamak, the lawyer was told unofficially the Siamak had been arrested and would not be going home that day. Siamak's brother and lawyer left to inform the rest of the family, who were understandably upset.

32.    Two hours later Siamak was released from this false detention. He had not in fact been arrested and had not been informed that his family was told that he was detained. He was not given his passports back nor was he permitted to leave Iran. It appears the entire incident was staged to further intimidate and scare Siamak's family.

33.    On October 13, 2015, Siamak Namazi was summoned once again for an

---

[1] Siamak had hired an attorney to represent him, but the lawyer's ability to defend Siamak was severely limited. Siamak was told that it was an official policy that anyone accused of a crime related to national security may only be represented by an "approved lawyer." Siamak repeatedly asked to see the list of approved lawyers, but he was ultimately never shown the purported list. As a result, he didn't have a lawyer who could be present with Siamak during any of the interrogations.

interrogation. Later that day, he was arrested by the members of the IRGC. They handcuffed and blindfolded Siamak. While Siamak was being arrested, the IRGC raided his parents' apartment and spend hours searching everywhere they wanted and taking whatever they pleased – even family albums.

34.     A video of the moment of his arrest was broadcast on Iranian online media outlets. It was later discovered that Siamak's social media accounts had been hacked at the time he was being arrested. Emails with viruses and malicious links were sent to many of his personal contacts, including some well-respected international journalists and foreign policy professionals.

35.     Someone, not Siamak, also initiated Facebook chats with his Facebook connections. Many of those connections almost immediately noticed that Siamak was not the one sending the messages because the writing style, type of questions, and frequency of grammatical errors were inconsistent with Siamak's own writing, but a few fell victim to the false chat. It was a ruse to send a virus to the victim's computer in order to hack it.

36.     Without providing any further information, Siamak was taken to the special Ward 2A wing of Evin Prison that is under the full control of the IRGC. Siamak was given the identity "Prisoner 94-146." There, they made him change into a prisoner's garb and threw him into a solitary cell roughly three yards by a yard and a half—the size of a walk-in closet. He would remain in that solitary cell for the first two months of his detention. His family had no access, no information and no word from Siamak for some time after his arrest.

37.     Siamak's captors never hid the fact that he was a hostage. Only days after his arrest, IRGC officials informed him that he was "prisoner #1" of their new project – a systematic plan of serial hostage-taking to ensure Iran always had "stock" to leverage in negotiations with the U.S. government. On multiple occasions, the IRGC captors explicitly referred to Siamak as a hostage

and explained that he would be held as long as it took for Iran to negotiate a suitable exchange with the American government, just as what had been done with Washington Post reporter Jason Rezaian and other hostages of Iran. Throughout the years of his captivity, senior Iranian officials (including the president and foreign minister) regularly mentioned in domestic and international press their intention to "exchange" Siamak and other dual-national detainees for blocked Iranian assets or other concessions from the West. This narrative underscored Siamak's identity as a victim of hostage taking as it made clear that Siamak's freedom depended not on the justice system but on Iran's foreign policy strategies.

### Mohammed Baquer Namazi's Arrest

38. Following Siamak's arrest and imprisonment, Siamak's father, Baquer Namazi, attempted to visit his son at Evin Prison two to three times each week, but was never granted access – even when he had letters from prison officials granting him the right to see his son.

39. On or about February 21, 2016, while Baquer was traveling overseas to see other family, Siamak's mother received a called from Evin Prison that special permission had been granted for Baquer to visit Siamak, but that the permission was valid only for a visit on February 24, 2016. Baquer quickly arranged travel plans to return to Tehran.

40. On February 22, 2016, Baquer flew into Tehran Airport where he was intercepted by IRGC guards upon leaving the aircraft and at passport control. The IRGC drove Baquer back to his home, where about a half dozen guards commenced a search of the house. The IRGC showed Baquer and his wife a document they claimed to be a search warrant for Baquer's belongings. They once again looked through everything in the house, even where patently obvious that the items did not belong to Baquer, such as drawers with Baquer's wife's personal effects. The IRGC's search and occupation of the house continued through midnight, after which Baquer was taken away.

41.     Like Siamak, Baquer's personal electronics were confiscated, as were his passports. Additionally, the IRGC seized various personal photos and documents, including those belonging to his wife and deceased mother-in-law.

42.     Days later, copies of many photos were broadcast by Iranian state media in coverage connected with this case. Throughout the search, Baquer asked about Siamak, but the IRGC guards refused to give him any information.

43.     After the search was over, the IRGC guards informed Baquer that they needed to present him to the magistrate. The IRGC guards produced a document that they claimed to be an authorization for this, perhaps the same document they claimed was a search warrant.

44.     Baquer was immediately taken to Evin Prison and brought into the same IRGC-controlled wing as Siamak.

45.      A few days after his arrest, Baquer left a message on the home answering machine – (the first contact since his arrest) – wherein he asked that the family keep his arrest quiet and conveyed that he was facing the same broad charges as Siamak.

**The Trial and Appeals of Siamak and Baquer**

46.     Soon after his arrest, Siamak was taken to the magistrate and formally charged under Section 508 of the Iranian Penal Code for "cooperation with a hostile state," i.e., the United States. He was accused of being responsible for a drop in Iran's population growth rate, of sending viruses to undermine Iran's nuclear program and of having "hacked" Iran's SMS system and leaked users' data to the U.S. government in 2000, years before text messaging was even available in Iran.

47.     The first and only hearings at the trial level occurred in early October 2016 - Siamak's on October 1, and Baquer's on October 5.

48.     Both hearings were secret and excluded members of the press and the public from attending. The hearings took place before Judge Abolqasem Salavati, head of the 15th branch of the Islamic Revolutionary Court in Tehran, who was well known for meting out harsh sentences on political cases and was later subjected to sanctions for this reason and placed on the U.S. Specially-Designated Nationals ("SDN") List by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") on December 19, 2019.

49.     Before the hearings, Siamak and Baquer had extremely limited access to legal representation. They were only allowed to meet with their attorneys for a brief twenty minutes a few days before the hearing, despite numerous attempts to meet beforehand.

50.     The attorneys were only provided with access to court "files" and "evidence" a few days in advance of the trials, making it practically impossible to prepare a meaningful defense. Furthermore, they were only allowed to briefly view the files and were not able to make or retain their own copies.

51.     The trial hearings only lasted a few hours, during which the Namazis continuously insulted and were denied fundamental due process rights.

52.     They were not allowed to present any evidence or call witnesses, and they were denied the opportunity to meaningfully challenge any charges or evidence – despite the fact that the IRGC had been conducting relentless interrogations for months in advance and without allowing access to legal representation.

53.     On October 17, 2016, both were sentenced to ten years in prison on the charges of "collusion with a hostile state," in reference to the United States. This is the maximum possible penalty that can be imposed for these criminal offenses under Article 508 of Iran's Islamic Penal Code. No written copy of the verdicts was ever provided to the Namazis.

54.    At the same time, the IRGC-affiliated websites and media were running a continuous negative campaign against the Namazis, stating them to be U.S. "infiltrators" and showing copies of their passports and photos, which had been taken from the family's house by the IRGC.

55.    The Namazis immediately appealed the convictions and sentences, though they could only do so in the most general sense, as they did not have access to any of the evidence or the final verdict of the trial court.

56.    An appeal hearing took place before the 36th Branch of the Appeals Court on March 1, 2017, during which both cases were considered. In total, the hearing was no more than two to three hours.

57.    Siamak was brought to the hearing late because the guards escorting him claimed to get "lost" – though it was likely a deliberate attempt to undermine the appeal process. The judge did not reschedule or extend the hearing to make up for lost time. As a result, Baquer's case was considered for approximately two hours, while Siamak's was only considered for 30 to 45 minutes.

58.    The appeal was supposed to have been heard by a panel of three judges, however only one judge was actually present. Press and the public were also barred from the appeal hearing.

59.    On January 24, 2019, made public that Iran's Supreme Court rejected both of the Namazis' appeals without explanation.

**The Torture and Terrible Prison Conditions Siamak and Baquer Endured**

60.    Both Siamak and Baquer were held in the Ward 2A section of the infamous Evin Prison of Tehran which is known for the use of cruel and prolonged torture of political opponents of the government.

61.    This "special wing" of the prison is controlled solely by the IRGC and operates

with no semblance of transparency or legality.

62.     Siamak Namazi was intimidated and continually underwent lengthy interrogations by the IRGC, even after his conviction.

63.     He was subjected to extended periods of solitary confinement. While he lost track of the exact amount of time, he estimates that he spent a total of 6-8 months in solitary confinement over the 27 months that he was in the IRGC detention center. He was put in a cell that was dark, cold and lacked a bed, forcing him to sleep on the concrete floor. He was initially not provided with warm clothing, even as temperatures dropped in the winter.

64.     He was tortured by the IRGC guards and was chained, beaten, threatened to be tased in his genitalia, threatened to be injected with unknown substances, and forced to watch government propaganda attacking him and showing his father in prison. Siamak was told at times that his father is gravely ill and had been taken to the hospital.

65.     Eventually, in December 2016, Siamak was transferred to Ward 4A of the Evin Prison.

66.     Having no other means of protesting against his prison conditions and the manifold violations of his rights, he started a hunger strike during his incarceration. He lost 26 pounds (~12 kilograms) during his time in the detention center. Despite reporting ailments to the IRGC guards, he received no medical treatment.

67.     Among the many medical problems that Siamak endured while in prison were cracked teeth that received no dental intervention, orthopedic problems including torn tendons in right shoulder, ankle injury from a fall, misaligned right kneecap and partially torn ACL; eye problems including a swollen and itchy stye on his right eye with blocked ducts; reduced vision and heightened sensitivity in left eye; hearing issues in his left ear; irritable bowel syndrome; and

COVID-19 symptoms multiple times, including intense joint pain, flu-like symptoms, long-lasting fatigue, and loss of smell. Evin Prison became a true nightmare when COVID-19 hit. For months, the prison's only response to the pandemic was to make it a punishable offense for any inmate to suggest they might have COVID. Some prisoners succumbed to the virus, and nearly all of the prisoners contracted it several times. Siamak personally contracted every strain that emerged during those years.

68.    Baquer's deteriorating health became one of the interrogators' most effective tools of psychological torture. The constant pressure they exerted on Baquer led to repeated hospitalizations, including emergency transports and multiple heart surgeries, one of which involved implanting a pacemaker. On one occasion, Siamak was summoned to the interrogation room and informed that his father had been rushed to the hospital in critical condition. The IRGC officials told Siamak that unless he "cooperated," he would not be allowed to see Baquer one last time before he died. For weeks, Siamak lived with the agonizing dread that his father might pass away without him having the chance to say goodbye. During a subsequent phone call with his mother, Siamak learned that while Baquer had indeed been hospitalized, he was not on his deathbed. Still, this torment lingered, leaving Siamak in constant fear for his father's life. The IRGC captors even forced him to watch a state-produced "documentary" about his father's detention, which aired on national television, celebrating their "capture" of the Namazis. They would regularly threaten to arrest Siamak's mother as well unless he complied with their demands.

69.    The physical and mental suffering intentionally inflicted on Siamak, combined with his extended isolation, caused Siamak's mental and physical wellbeing to severely deteriorate.

70.    At the time of his arrest and imprisonment Baquer Namazi was 79 years old. He was similarly held in harsh prison conditions, including extensive periods of solitary confinement.

At the time of his arrest he had a serious heart conditions, including arrhythmia, that required him to take special medications. He previously had gone through triple bypass surgery due to his heart condition.

71.    During his imprisonment Baquer developed severe stomach issues; he lost at least 30 pounds (~14 kilograms) and his energy greatly diminished.  He lost five teeth.  He was often weak and dizzy and suffered from severe back pain.

72.    Baquer endured intense mental pressure from his interrogators.  He was subject to threats of personal violence and promises of execution.  He was placed in solitary confinement for 21 days devoid of basic facilities.

73.    In a highly unusual move that evidences the severity of his current condition, the IRGC did transfer Baquer to an external hospital for a period of several days on two separate occasions during his arrest, without providing any explanation to his family. Baquer's family urgently requested that Baquer's own heart specialist be allowed to see him, but this request was denied.

74.     Additionally, both Baquer and Siamak were repeatedly denied the weekly family visits allowed for other prisoners and have had extremely limited access to their attorneys, seeing them only for twenty minutes before their trials while their interrogators hovered over them.

75.    Eventually Effie Namazi was allowed to limited visits with her husband and son, but was not able to bring them anything during these visits;

76.    Baquer and Siamak were only allowed to see each other for the first time on February 28, 2017, the day before their appeal hearing and only for about 20 minutes.  In the last few months of Baquer's time in the detention center, Baquer and Siamak were finally moved into the same cell. This decision was not due to any newfound mercy from the IRGC. Rather, it was a

practical solution after Baquer underwent a major heart operation and had a pacemaker implanted. He required full-time care, and the Revolutionary Guards saw Siamak as the most convenient option for a nurse. Siamak took on the role of his father's caregiver, washing his clothes by hand, bathing him, shaving him, and attending to his basic needs.

### The Eventual Release of Baquer and Siamak Following Their Unlawful Detention

77.    On January 15, 2018 Baquer Namazi was released from prison on a renewable medical parole. But he was trapped in Iran and the IRGC refused to return his passports or allow him to travel abroad for medical treatment.

78.    Finally, on October 5, 2022, at the age of 85, and after more than 6 ½ years (2417 total days) of illegal detention in Evin Prison and then in Iran, Baquer Namazi was allowed to leave Iran and was flown to Muscat, Oman.

79.    He was in need of immediate medical attention to clear out a severe blockage to his left internal carotid artery (ICA), which put him at very high risk for a stroke.

80.    The release came after UN Secretary General António Guterres appealed to the President of Iran for Baquer Namazi, to be permitted to leave Iran for medical treatment abroad.

81.    Although Baquer was released, Siamak continued to be detained on an unlawful basis.

82.    Finally, after more than eight years of confinement and imprisonment, on September 22, 2023, Siamak Namazi was finally freed. He was held a total of 2,983 days during which he endured endless torment.

83.    Siamak was one of five American citizens released from Iranian detention as part of a prisoner swap and deal between the Iranian and U.S. governments.

### The Political Environment in Iran at the Time of Siamak and Baquer

84.     The Iranian Regime's arrest and detention of Siamak and Baquer occurred in 2015 and 2016, during a very sensitive period in the relationship between the United States and Iran. At the time of the arrest, the United States and other world powers were working on implementing the JCPOA, including the lifting of economic sanctions against Iran in exchange for the dismantling of certain aspects of Iran's nuclear program.

85.     The United States initially imposed sanctions on Iran in 1979, following the Islamic Revolution, when 52 U.S. nationals were taken hostage for 444 days. The two countries have had a contentious relationship ever since. In 1987, the United States imposed an embargo on Iranian goods and services in response to its support of terrorism in the Persian Gulf. Between 1995 and 1997, the United States effectively banned all trade and investment activities with Iran.

86.     In 2006, the U.N. Security Council passed Resolution 1737 and imposed additional sanctions on Iran after it refused to suspend its uranium enrichment program. The U.N. sanctions banned the supply of nuclear-related technology and materials to Iran and froze the assets of individuals and companies related to the enrichment program. These sanctions were strengthened in 2007 and again in 2010.

87.     In 2006 and 2008, China, France, Russia, the United Kingdom, and the United States— the permanent members of the U.N. Security Council—along with Germany (together, the "P5+1") proposed framework agreements to halt Iran's uranium enrichment program. In 2009, the United States announced that it would participate fully in the P5+1 discussions with Iran and the P5+1 met with Iran to discuss the proposals in January 2011. These negotiations were suspended in the spring of 2013.

88.     In August 2013, newly elected President Hassan Rouhani called for Iran to resume serious negotiations with the P5+1 over Iran's nuclear program. Negotiations between the P5+1 and Iran intensified over the following year.

89.     The nuclear negotiations between Iran and the P5+1 caused significant tension between Defendant IRGC and Iranian President Rouhani's comparatively more progressive administration. High-level IRGC officials criticized and sought to undermine the Rouhani administration's efforts to engage with the United States and other Western powers over Iran's nuclear program.

90.     President Rouhani's electoral victory in 2013 was opposed by Iran's hardline factions. Although President Rouhani's election was welcomed as a sign of modest progress toward reform and potential partial reconciliation with the West, Rouhani's authority and that of subsequent presidents of Iran remained subject to the authority of the Supreme Leader.

91.     In July 2014, Iran and the P5+1 met in Vienna to discuss a comprehensive nuclear agreement. The parties also announced Iran would convert 25 kilograms of enriched uranium powder into fuel plates that could not be used for weapons and blend down another three tons of enriched uranium to make it unfit for weapons. In exchange for these concessions, the P5+1 committed to repatriating $2.8 billion in funds. The parties agreed to resume talks in August 2014.

92.     These discussions eventually led to the JCPOA on July 14, 2015, between Iran and the P5+1, which was to be followed by an intensive and sensitive period of implementation phases.

**Iranian Regime took Siamak and Baquer Hostage for Political Purposes**

93.     The Iranian Regime has an extensive, well-documented history of taking American hostages. On the heels of the Islamic Revolution in 1979, Iranian militants seized the American Embassy in Tehran and took 52 U.S. diplomatic and military personnel hostage. These hostages

remained in Iranian custody for 444 days and were subjected to physical and mental torture and inhumane conditions of confinement.

94.     Like Siamak and Baquer, those hostages were blindfolded; held in isolation; provided minimal clothing, food, water, and medical care; and prohibited from communicating with one another or their families. The hostages were subjected to repeated interrogations and threatened with physical injury. The hostages ultimately were released after the United States agreed to unfreeze Iranian assets in the United States and terminate all legal proceedings against Iran in U.S. courts.

95.     During the ensuing four decades, the Iranian Regime has consistently targeted American citizens for hostage taking and has sponsored, supported and/or committed numerous heinous acts of terror, including the murder and maiming of U.S. citizens and others, with devastating effect upon their families.

96.      Following their past pattern and practices, Defendant plainly had the state of mind of a hostage taker.

97.     During Siamak and Baquer's imprisonment in Evin Prison, Iranian guards, interrogators, other officials in the Iranian judiciary, and state-run media repeatedly stated that they would be used as bargaining chips to exchange for money with the United States.

98.     As reported in a wide variety of media sources, Iranian officials' various public statements demonstrate that Iran arrested and imprisoned Americans as a hostages for whom it could obtain persons or assets of value in an exchange with the United States. For example: In September 2015, President Rouhani suggested that "[i]f the Americans take the appropriate steps and set [Iranian prisoners] free, certainly the right environment will be open and the right circumstances will be created for us to do everything within our power and our purview to bring

about the swiftest freedom for the Americans held in Iran as well."

**Aftermath of Baquer and Siamak Namazi's Lengthy Imprisonment in Iran**

99.    Siamak and Baquer's unlawful arrest and subsequent arbitrary detentions have caused severe and enduring and unbearable physical, psychological and emotional injuries and other pain and suffering, which injuries are ongoing, all to his damage.

100.    They each suffered from malnutrition and lost significant weight as detailed above. They continue to be affected by these physical injuries and have required ongoing medical care since their release.

101.    During his imprisonment, Siamak Namazi suffered severe depression, high anxiety and emotional anguish.  He worried constantly for his family's safety and about his father's health and safety.

102.    Upon his release, Siamak has sought and continues to seek medical care from professionals to help treat him for his injuries.

103.    Siamak continues to suffer from anxiety, depression, sleeplessness and other symptoms.

104.    These injuries continue to significantly impact Siamak's ability to lead a normal life including making it difficult for him to reintegrate into family life. He became detached from his family and friends and fears that the impact of his experiences at the hands of the Iranians will be permanent.

105.    Similarly, during his imprisonment, Baquer, suffered severe depression and emotional anguish.  He worried constantly for his family's safety and about his son's health and safety.

106.    Upon his release, Baquer needed urgent medical attention. Since that time, he

sought and continues to seek medical care from professionals to help treat him for his injuries.

107.    Baquer continues to suffer from anxiety, depression, sleeplessness and other symptoms.

108.    These injuries continue to significantly impact Baquer's ability to lead a normal life including the relationship with his wife Effie.

109.    Both Siamak Namazi and Baquer Namazi suffered direct financial loss as a result of their unlawful arrest and detention. Their ability to labor and earn money has been severely limited.

110.    They have each lost significant personal property because of their imprisonment in Iran.

111.    They have incurred significant expenses since returning from Iran to the United States in an attempt to rebuild their family and professional lives.

112.    They continue to live in fear of repercussion from the Iranian government against them and their family and property owned by Baquer and Effie Namazi which remains in Iran.

**COUNT I**
**28 U.S.C. §1605A(c)**
**Hostage Taking, Torture and Wrongful Imprisonment**

113.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

114.    As recounted above, the hostage taking and unlawful imprisonment of Siamak and Baquer was caused by a willful and deliberate act of terror committed by the Islamic Republic of Iran, as it was a hostage taking or torture committed by a foreign state or their officials, employees or agents of such foreign state which caused the personal injuries to the Plaintiffs.

115.    Seizing individuals in an effort to extract concessions from the United States and

22

others is hostage taking falling within the definition of the FSIA.

116.    Siamak and Baquer were both arrested and held at Evin Prison, a facility notorious for its brutal mistreatment of political prisoners and was imprisoned without due process. Siamak was imprisoned and illegally detained for more than eight years (8 years in Evin prison and three months when he was illegally detained) and Baquer was imprisoned and illegally detained for approximately six and one-half years (four years in Evin Prison and two and half years in Iran where he was illegally detained). During much of their individual imprisonments, Siamak and Baquer were denied access to competent counsel, and spent much of their time in solitary confinement or in horrible prison conditions that subjected them to torture, and psychologically and physically damaging conditions.

117.    Throughout their confinement, statements were made to both Siamak and Baquer by government officials and prison authorities which indicated they were being held to extract further concessions from the United States, such as prisoner exchanges.

118.    The legal proceedings which Siamak and Baquer were afforded were sham proceedings created only for pretextual purposes. They did not receive due process, nor were they able to present meaningful defenses to the bogus charges brought against them although there was no evidence of any unlawful activities which either of them allegedly committed.

119.    Baquer was finally allowed to leave Iran on medical grounds on October 1, 2022, so he could seek medical treatment abroad. Siamak was released on September 18, 2023, in a high value deal between the United States and Iran. Siamak was held in illegally detained in Iran for 2983 days and Baquer was illegally detained in Iran for 2417 days.

120.    As a direct and proximate result of the willful, wrongful and intentional acts of the Defendant hereinabove described, the Plaintiffs suffered numerous injuries including but not

limited to physical and psychological injuries, emotional injuries, loss of solatium and other pain and suffering as a direct result of the Defendant's unlawful and brutal detention and abuse of Siamak and Baquer. Siamak and Baquer have ongoing physical injuries which continue to require ongoing medical care and treatment. The full measure of Plaintiffs' injuries is likely not yet known.

121.    Siamak and Baquer's imprisonments have resulted and will continue to result in economic injury to the Plaintiffs and have caused them to suffer significant financial losses, to date and in the future, in amounts as will be proven.

WHEREFORE, the Plaintiffs and each of them demand that judgment be entered against the Defendant for pain, suffering, mental anguish, emotional distress, and solatium in amounts to be proven, and for their costs expended, including attorneys' fees, and as otherwise as permitted by this Court.

**COUNT II**
**Torture pursuant to the Torture Victims Protection Act 1991 (28 U.S.C. 1350 note)**

122.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

123.    Under the FSIA, torture is defined to "have the meaning given in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. §1350 note)" ("TVPA"). 28 U.S.C. §1605A(h)(7). The TVPA defines torture as "any act directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on  an individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that the individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any

kind." Pub. L. No. 102-256 § 3(b)(1), 106 Stat. 72, 73 (1992) codified at 28 U.S.C. § 1350 (note).

124.    Siamak Namazi was subjected to grueling interrogation sessions involving severe physical and psychological strain. He was intimidated, disoriented, blindfolded, denied access to competent legal counsel, denied visitation by foreign government representatives and family members or friends, physically threatened, blindfolded, beaten, chained up, threatened with a taser psychologically abused and faced with further threats to his safety.

125.    Siamak Namazi was denied adequate nutrition, denied access to competent medical care or sanitary facilities.  This deprivation of basic care caused Siamak Namazi significant physical injury.

126.    Baquer Namazi was subjected to grueling interrogation sessions involving severe physical and psychological strain. He was intimidated, disoriented, blindfolded, transported around the prison, denied access to competent legal counsel, denied visitation by foreign government representatives and family members or friends, physically threatened, psychologically abused and faced with threats to his safety.

127.    Baquer Namazi was denied adequate nutrition, denied access to competent medical care or sanitary facilities, including treatment for his severe heart condition. This deprivation of basic care caused Baquer Namazi significant physical injury.

128.    Siamak and Baquer's confinement constitutes torture within the meaning of the FSIA and TVPA.

129.    Defendant's torture of Siamak and Baquer resulted in severe physical injuries, and psychological and emotional injuries, including post-traumatic stress disorder.

WHEREFORE, Siamak and Baquer Namazi demand that judgment be entered against the Defendant for the torture, pain, suffering, mental anguish, emotional distress and other losses and

damages in such amounts as shall be proven, and for costs expended, including attorneys' fees, and as otherwise as permitted by this Court.

## COUNT III
## LOSS OF SOLATIUM
### Under 28 U.S.C. §1605A(c)

130.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

131.    During his imprisonment Siamak, Siamak suffered severe emotional distress, mental pain and suffering as a result of the imprisonment of his father, Baquer Namazi.

132.    During his imprisonment Baquer, Baquer suffered severe emotional distress, mental pain and suffering as a result of the imprisonment of his son, Siamak Namazi.

133.    The Defendant's extreme and outrageous conduct of holding Siamak and Baquer hostage and inflicting torture upon them caused Siamak and Baquer each to suffer from severe emotional harm, particularly knowing that the extreme conditions and torture they each were suffering and seeing being inflicted on each other caused severe emotional distress including depression, persistent feelings of guilt, post-traumatic stress disorder causing solatium and other damages, in such amounts as shall be proven.

134.    Accordingly, Plaintiffs bring claims for their loss of solatium against the Defendant pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia, as same may apply to the causes of actions asserted herein and arising from the conduct of the Defendant.

WHEREFORE, Plaintiffs demands that judgment be entered against the Defendant in such amounts as shall be proven for their compensatory damages, and otherwise as permitted by this Court.

## COUNT IV
## PUNITIVE DAMAGES
### (Under 28 U.S.C. § 1605A(c))

135.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

136.    The actions of the Islamic Republic of Iran, which has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, and certainly since 1984 when it was designated as a State Sponsor of Terror; are heinous in nature, politically motivated, and intentionally target the United States of America and its citizens.

137.    The acts of the Defendant, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The hostage taking and torture endured by Siamak and Baquer and as described above was intended to and did extract extreme pain and suffering on Siamak and Baquer, their family and to extract concessions from the United States. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

138.    The actions of the Defendant, as set forth hereinabove, were intentional and malicious and in willful, wanton, and reckless disregard of Siamak and Baquer's rights and physical well-being. The actions of the Defendant were part of its ongoing and continuing campaign of hostage taking and terror committed against citizens of the United States of America to affect U.S. foreign policy in the region, and to use of hostage taking and terror as a means of obtaining concessions from the United States, including high value prisoner exchanges. A maximal award of punitive damages is requested as against Defendant in accordance with the

provisions of 28 U.S.C. §1605A(c), which is liable for punitive damages.

WHEREFORE, the Plaintiffs pray that judgment be entered against the Islamic Republic of Iran in an amount determined by this Court to deter the Defendant from further hostage taking and torture of American citizens.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, request this Court find the Defendant liable for the Causes of Action listed above and enter Judgment against the Defendant as follows:

1.    Awarding Plaintiffs compensatory damages against the Defendant in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

2.    Awarding Plaintiffs solatium damages against the Defendant, in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

3.    Awarding Plaintiffs punitive or exemplary damages against Defendant jointly and severally, in amounts consistent with evidence as shall be determined at trial in accordance with evidence to be submitted to this Court;

4.    Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

5.    Awarding Plaintiffs their costs and disbursements and reasonable allowances of reasonable fees for Plaintiffs' counsel and experts and reimbursement of expenses;

6.    Leave to amend this Complaint as the interests of justice may allow; and

7.    Granting any and all such further relief as the Court may deem just and proper.

Dated: December 17, 2024

Respectfully submitted,

HEIDEMAN NUDELMAN & KALIK, P.C.
5335 Wisconsin Ave., Suite 440
Washington, D.C. 20015
(202) 463-1818

By: */s/Richard D. Heideman*
    Richard D. Heideman (DC Bar No. 377462)
    Noel J. Nudelman (DC Bar No. 449969)
    Tracy Reichman Kalik (DC Bar No. 462055)
    Joseph H. Tipograph (DC Bar No. 997533)

*Counsel for Plaintiffs*

Jared M. Genser
PERSEUS STRATEGIES, LLC
1802 Vernon Street, NW, #1046
Washington, D.C. 20009
(202) 466-3069

*Of Counsel for Plaintiffs*