UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIAMAK NAMAZI &
MOHAMMAD BAQUER NAMAZI,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN,

Defendant.

Civil Action No. 24-3506 (JEB)

**MEMORANDUM OPINION**

When Siamak Namazi flew to Iran to attend a funeral in July of 2015, he could hardly have imagined that the four-day trip he had planned would turn into an eight-year ordeal ending only in a prisoner swap. Nor could he have suspected that his elderly father, Mohammad Baquer Namazi, would join him in prison in February of the following year. Siamak and Baquer Namazi, summarily convicted on charges relating to their ties to the United States, where they are citizens, were detained, interrogated, and tortured by the Islamic Revolutionary Guard Corps in the infamous Evin Prison for eight and two years, respectively. Father and son now seek to hold Iran liable for damages under the terrorism exception to the Foreign Sovereign Immunities Act. The Court entered default last year because Iran failed to appear.

Because Plaintiffs have successfully navigated the FSIA's many procedural prerequisites and sufficiently demonstrated Iran's liability under the Act's federal cause of action, they have earned a default judgment. Apportioning damages is less straightforward, but the Court ultimately finds appropriate the awarding of $87,552,284 in compensatory and punitive damages to Siamak Namazi and $34,236,889 to Baquer Namazi, totaling $121,789,173 in damages.

1

## I.    Background

At this stage, the Court draws on the uncontroverted facts alleged in and supported by Plaintiffs' filings.  Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

Siamak Namazi was born in Iran about seven years before the Iranian Revolution.  See ECF No. 7 (Am. Compl.), ¶ 12.  His father, Baquer Namazi, had been a provincial governor under the Shah's government.  Id., ¶ 15.  (The Court will refer to Plaintiffs by their first names to avoid confusion and not out of any disrespect.)  As post-revolutionary Iran took shape, their family of four fled the country in the early 1980s and settled in the United States, where Baquer was naturalized as a U.S. citizen in 1989, followed by Siamak in 1993.  Id., ¶¶ 12, 15; ECF No. 19-3 (Declaration of Mohammad Baquer Namazi), ¶¶ 2, 12.  Baquer continued his public service outside of Iran, working with UNICEF on development and conflict issues in Africa for over a decade.  See Baquer Decl., ¶ 14.  He went home to Iran during reformist Mohammad Khatami's presidency to support the founding of a civil-society organization, left the country again sometime after the 2005 election of Mahmud Ahmedinejad turned the political tides, and returned once more a couple years later after assurances of safety.  Id., ¶¶ 18–19.

Meanwhile, after earning his bachelor's degree in the United States, Siamak launched an international career of his own that also repeatedly brought him back home to Iran: he completed his compulsory service in Iran's Ministry of Housing and Urban Planning from 1994 to 1996, returned to the U.S. for a master's degree, and proceeded to assume various private-sector positions in the U.S., Iran, and Dubai.  See Am. Compl., ¶¶ 12–13.  In addition to his private-sector career, he held fellowships at the Center for Strategic and International Studies in 2001, the Woodrow Wilson International Center for Scholars in 2005, and the National Endowment for Democracy from 2005 to 2006.  Id., ¶ 12; ECF No. 19-2 (Declaration of Siamak Namazi), ¶ 11.

These affiliations did not escape the notice of the Iranian government, which interrogated him about them in 2007.  See Siamak Decl., ¶ 11.  After earning an MBA in London in 2011, he returned to the United Arab Emirates, where he rose to lead strategic planning at an energy company.  See Am. Compl., ¶¶ 13–14.

By 2013, Siamak had resumed traveling to Iran for short stays, planning one such trip for four days in July of 2015.  Id.  During that trip, he attended a funeral and visited with family and friends before beginning his journey back to Dubai.  Id., ¶ 21.  As he approached passport control in Tehran's airport, however, he was surrounded by plainclothes IRGC guards, who flashed a phony "exit ban" and whisked him away for questioning regarding those same NGO affiliations over which he had been interrogated — and cleared of any wrongdoing — nearly a decade prior.  Id., ¶¶ 19–20, 22–23.  He was forced into a car in the parking lot, and his devices and passports were confiscated.  Id., ¶ 23.  Released on instructions not to leave Tehran, he was questioned at least every few days for the next three months at unpredictable times in unmarked locations.  Id., ¶¶ 25–27.  The IRGC's tactics then escalated, with staged arrest scenes and even a two-hour false detention at Evin Prison, Iran's most notorious.  Id., ¶¶ 29–32.  All of this was foreshadowing: on October 13, 2015, after another interrogation summons, Siamak was handcuffed, blindfolded, and thrown into a solitary-confinement cell measuring three yards by one-and-a-half in Evin Prison.  Id., ¶¶ 33, 36.

On February 22 of the following year, Siamak was joined there by his father, Baquer.  Id., ¶ 40.  Baquer had been traveling overseas when he was lured back to Tehran by the false promise of visiting his imprisoned son.  Id., ¶¶ 39–40.  The IRGC seized the inbound traveler at the airport, transported him to his house to search it, confiscated his electronics and passports, and jailed him in Evin.  Id., ¶¶ 40–44.  In October of 2016, both Siamak and Baquer were

secretly and summarily tried and convicted for "cooperation with a hostile state" — *i.e.*, the United States — and handed ten-year sentences. Id., ¶¶ 46–59. A sham appeal made no difference. Id., ¶¶ 56–59.

So began Plaintiffs' years of torture in Evin Prison — ultimately, about eight for Siamak and two for Baquer. Id., ¶¶ 8–9, 77, 82. Siamak, who spent frequent and lengthy stints in solitary confinement, was repeatedly beaten, chained, and threatened. Id., ¶¶ 62–64. Baquer, who was 79 at the time of his arrest, was also crammed into solitary confinement and threatened with execution. Id., ¶¶ 70–72. Siamak was forced to watch videos of his father being interrogated, and the suffering of each was generally used against the other as an interrogation tactic. See Siamak Decl., ¶ 42; Baquer Decl., ¶ 34. Both were routinely denied medical care despite serious ailments and, in Baquer's case, a history of heart conditions and surgeries. See Am. Compl., ¶¶ 66–67, 70–73. They were eventually moved into the same cell so that Siamak could nurse his father back to something barely resembling health after a heart procedure that Baquer was permitted to undergo. Id., ¶ 76.

On January 15, 2018, Baquer, now in his early 80s, was released from prison on medical parole but ordered to remain in Iran. Id., ¶ 77. Over four years later on October 5, 2022, at the behest of UN Secretary General António Guterres, he was permitted to travel to Oman for urgently needed medical treatment for his deteriorating heart condition. Id., ¶¶ 78–80. A year later, on September 22, 2023, Siamak, who had explicitly been called a hostage by his captors, was also set free in a prisoner swap alongside five other Americans. Id., ¶¶ 37, 82–83.

Although now safely in the U.S. and far from Iran, the Namazis' time in Evin Prison has sentenced them to long-term physical and psychological afflictions including deteriorated hearing and eyesight, ongoing muscle and joint pain, anxiety, depression, sleeplessness, and

4

PTSD.  Id., ¶¶ 99–108; Siamak Decl., ¶¶ 60, 63; Baquer Decl., ¶¶ 41–47.  Despite his best efforts, Siamak has been unable to secure employment.  See Siamak Decl., ¶ 64.

The Namazis filed this lawsuit against the Islamic Republic of Iran in December of 2024 to seek what redress the law can provide.  See ECF No. 1 (Compl.); Am. Compl.  Having effected service on September 28, 2025, and hearing no answer from Iran, Plaintiffs requested an entry of default on December 14, 2025, which was granted the following day.  See ECF Nos. 13 (Return of Service); 14 (Affidavit for Default); 15 (Entry of Default).  They now move for default judgment.  The Court has also permitted Plaintiffs to submit certain unredacted filings, associated with their Motion for Default Judgment, under seal.  See Minute Order of Mar. 31, 2026.

## II.    Legal Standard

Foreign states are generally immune from suit in federal court, subject to exceptions codified in the Foreign Sovereign Immunities Act.  See 28 U.S.C. § 1604; see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court.").  Relevant here is § 1605A, the so-called "terrorism exception" to the FSIA.  See Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 352 (D.C. Cir. 2018).  This section provides federal courts with jurisdiction over suits where plaintiffs seek money damages from a foreign state for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  It also creates a cause of action for "national[s] of the United States" to sue foreign states that are designated by the U.S. government as sponsors of terrorism and perform or materially support the acts described in 28 U.S.C. § 1605A(a)(1).  Id., § 1605A(c)(1).  The statute specifies that,

5

"[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages." Id., § 1605A(c); accord Fraenkel, 892 F.3d at 353.

Where a defendant is "totally unresponsive," a court may enter default judgment if the default is plainly willful — as reflected by a defendant's failure to respond to the summons and complaint, the entry of default, or the motion for default judgment. Gutierrez v. Berg Contracting Inc., 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000) (quoting Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)). In the "'absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense,' it is clear that the standard for default judgment has been satisfied." Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (quoting Gutierrez, 2000 WL 331721, at *1).

To obtain a default judgment in such an action, plaintiffs must establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs who are successful may then recover damages by showing "that the projected consequences are reasonably certain (*i.e.*, more likely than not) to occur, and [proving] the amount of damages by a reasonable estimate." Fraenkel, 892 F.3d at 353 (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)). While these requirements create "some protection against an unfounded default judgment," plaintiffs need not produce "more or different evidence than a court would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." Id. (cleaned up and citation omitted).

**III.    Analysis**

The Court begins by wading through the substantial justiciability thicket around FSIA suits like this one, addressing subject-matter jurisdiction, personal jurisdiction, and the statutory cause of action in turn.  It then moves to Defendants' liability and damages awards.

Before addressing the principal jurisdictional issues, the Court notes that there is no statute-of-limitations barrier here — both because the filing of this suit about 15 months after Siamak's release places it comfortably within the FSIA's ten-year statute of limitations, see 28 U.S.C. § 1605A(b)(2); Compl., and because the Court lacks the "authority . . . to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant" anyway. Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1112 (D.C. Cir. 2019).

A.    Subject-Matter Jurisdiction

Subject-matter jurisdiction under the FSIA requires both the abrogation of sovereign immunity under § 1605A(a)(1) and the satisfaction of additional prerequisites for a court to hear the claim under § 1605A(a)(2).  The Court addresses each in turn.

1.    *Abrogation of Immunity Under § 1605A(a)(1)*

The terrorism exception to the FSIA provides federal courts with subject-matter jurisdiction over suits against a foreign state only where (1) "money damages are sought" (2) "against a foreign state for" (3) "personal injury or death that" (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1); see also Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 51 (D.D.C. 2012); Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 32 (D.D.C. 2012).

This suit checks all five boxes.  First, Plaintiffs seek only money damages.  See Am. Compl. at 30–31.  Second, Iran is a foreign state.  Third, the Namazis allege "severe personal injuries."  Id., ¶ 1.  Fourth, in FSIA cases like this one where the IRGC perpetrates the alleged torture and hostage taking, id., ¶¶ 60–76, causation is satisfied.  See Panahi v. Islamic Republic of Iran, 2020 WL 6591425, at *7 (D.D.C. Nov. 10, 2020); Abedini v. Islamic Republic of Iran, 422 F. Supp. 3d 118, 129 (D.D.C. 2019).  Fifth and finally, the Court explains in greater detail that the alleged torture and hostage taking fall within the meaning of those terms in the FSIA.

a.      Torture

The FSIA incorporates the definition of "torture" codified in the Torture Victim Protection Act of 1991:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering[,] . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual[,] . . . intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)); see also 28 U.S.C. § 1605A(h)(7) ("[T]he term[] 'torture' . . . [has] the meaning given [that term] in Section 3 of the Torture Victim Protection Act of 1991.").  Courts in this Circuit apply this definition under the Price criteria, looking to "(1) 'the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim'; and (2) the extent to which the 'production of pain and suffering is purposive.'"  Abedini, 422 F. Supp. 3d at 129 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002)).

Begin with Siamak, whose filings document Solzhenitsynian scenes of torture across eight years in Evin Prison.  He recounts that during interrogations, "[o]ften blindfolded, [he] was thrown into walls, kicked, screamed at, slapped, and constantly threatened with horrific corporal

punishment. They pulled at [his] hair and beard, chained [him] up, and attached taser wires to [his] private parts." Siamak Decl., ¶ 34. His captors threatened to "inject[ him] with unknown substances." Am. Compl., ¶ 64. They also threatened that unless he "cooperated" he would be forbidden from ever again seeing his deteriorating father, whose condition was dire but exaggerated to induce that cooperation. Id., ¶ 68; Siamak Decl., ¶ 43. He spent ten days in a solitary cell in which he "could not lie down straight and had to curl up to fit" and was repeatedly denied medical care. See Siamak Decl., ¶¶ 39, 54. If Baquer's treatment appears milder, it is only by comparison to his son's. During his two years in Evin, "[h]e was subject to threats of physical violence and promises of execution" and "placed in solitary confinement for 21 days devoid of basic facilities" with "barely enough room to lie down." Am. Compl., ¶ 72; Baquer Decl., ¶ 28. Despite his severe arrythmia, he too was denied medical treatment. See Baquer Decl., ¶ 29.

These actions by Iran easily fall within the FSIA's definition of torture, satisfying the Price criteria. See, e.g., Abedini, 422 F. Supp. 3d at 129–30 (Price criteria for torture satisfied by subjection of Evin prisoner to beating, shocking, whipping, confinement with "no space to move," and denial of medical care); Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 60–61, 68–69 (D.D.C. 2015) (same where Evin prisoner was physically beaten, threatened with death, kept in excruciating positions); id. at 67–68 (collecting similar cases). The Court has little doubt that Iran applied its machinery of torture, as the FSIA conceives of it, to the Namazis.

b.      Hostage Taking

The FSIA incorporates the definition of "hostage taking" from the International Convention Against the Taking of Hostages: "Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party . . . to do

9

or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages."  Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979); see also 28 U.S.C. § 1605A(h)(2) ("[T]he term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages.").  Our Circuit has instructed that "[t]he essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the convention."  Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 234–35 (D.C. Cir. 2003) (citing Price, 294 F.3d at 94).

Siamak's detention, at least, seems plainly directed toward that purpose.  He claims that his "captors explicitly referred to [him] as a hostage and explained that he would be held as long as it took for Iran to negotiate a suitable exchange with the American government."  Am. Compl., ¶ 37.  This was hardly a secret: Iran's president, foreign minister, and other senior officials publicly broadcast their intentions to "'exchange' Siamak and other dual-national detainees for blocked Iranian assets or other concessions from the West."  Id.  The plan worked: Siamak and four other Americans were released in a prisoner swap between the U.S. and Iran in September of 2023.  Id., ¶¶ 82–83; cf. Abedini, 422 F. Supp. 3d at 131 ("explicitly conditional" release in prisoner exchange shows hostage taking under FSIA).

The absence of similarly pled facts about Baquer's detention and release does not disturb the Court's jurisdiction under the FSIA because his torture suffices to bring his claims within the Act's scope as discussed above.  As a final note, the Court also has jurisdiction over both Siamak and Baquer's solatium claims, which arise out of the other's torture and/or hostage taking, for all the reasons stated in the previous sections.  See ECF No. 19-1 (Memo.) at 24–28; see generally

10

Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204 (D.D.C. 2012); Abedinigalangashy v. Gov't of the Islamic Republic of Iran, 2024 WL 4227133 (D.D.C. Sept. 18, 2024).

With the demonstrated torture of both father and son, the latter of whom was also plainly taken hostage, all five requirements for Iran to lose its sovereign immunity under the FSIA are met.

2.      *Claim Prerequisites Under § 1605A(a)(2)*

Sovereign immunity aside, FSIA plaintiffs face an additional hurdle.  Section 1605A(a)(2) provides that "[t]he court shall hear a claim under this section" only if three further conditions are met: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . and . . . remains so designated when the claim is filed"; (2) "the claimant or the victim was, at the time [of] the act[,] . . . a national of the United States"; and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).

This suit satisfies all three requirements.  First, Iran has been designated as a state sponsor of terrorism since 1984.  See Dep't of State, Bureau of Counterterrorism, State Sponsors of Terrorism, https://perma.cc/RMU8-DVMQ.  Second, Plaintiffs were both U.S. nationals throughout their captivity.  See Am. Compl., ¶¶ 7, 9, 12, 15.  Third, they gave Iran chance enough to arbitrate by including a request to arbitrate with other documents served on that country.  See ECF Nos. 8 (First Aff. Requesting Foreign Mailing); 10 (Second Aff. Requesting Foreign Mailing); Return of Service; see also Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 158 (D.D.C. 2017) (finding same process sufficient under § 1605A(a)(2)(A)(iii)).

Because this suit satisfies all the requirements of § 1605A(a)(1) and (a)(2), the Court concludes that it has subject-matter jurisdiction under the FSIA.

B.    Personal Jurisdiction

Turn now to personal jurisdiction, which the Court may exercise over a foreign state if service of process is properly effectuated under 28 U.S.C. § 1608(a).  See, e.g., Schubarth v. Fed. Republic of Germany, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018).  That statute prescribes the sequence of available alternatives: the summons and complaint may be delivered, first, "in accordance with any special arrangement for service between the plaintiff and the foreign state," 28 U.S.C. § 1608(a)(1), or, second, "in accordance with an applicable international convention on service of judicial documents."  Id., § 1608(a)(2).  If no such agreements exist, defendants must be served through a third method, which involves sending the requisite documents "by any form of mail requiring a signed receipt . . . to the head of the ministry of foreign affairs of the foreign state concerned."  Id., § 1608(a)(3).  And should that fail, plaintiffs may resort to a fourth method: the Clerk of the Court may send the packet to the Secretary of State for transmittal "through diplomatic channels to the foreign state."  Id., § 1608(a)(4); see also Republic of Sudan v. Harrison, 587 U.S. 1, 5 (2019).

Because Iran is party to neither a special arrangement nor an international convention on service, the first two methods are unavailable.  See Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 70 (D.D.C. 2010).  Plaintiffs tried method three, see First Aff. Requesting Foreign Mailing, and ultimately resorted to method four.  See Second Aff. Requesting Foreign Mailing; Return of Service.  Under that last method, the State Department transmitted the documents to Iran's Ministry of Foreign Affairs through the Embassy of Switzerland on September 28, 2025, rendering service effective as of that date.  See Return of Service; see also 28 U.S.C.

12

§ 1608(c)(1) ("Service shall be deemed to have been made[,] . . . in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note."). Plaintiffs have therefore established personal jurisdiction over Iran.

C.    Federal Cause of Action Under § 1605A(c)

Finally, although jurisdiction is assured, Plaintiffs still need a cause of action to get into court. See Owens v. Republic of Sudan, 864 F.3d 751, 807 (D.C. Cir. 2017) ("[T]he question whether a statute withdraws sovereign immunity is analytically distinct from whether a plaintiff has a cause of action.") (quotation marks and citation omitted). The FSIA was amended in 2008 to provide a federal cause of action to "(1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States, . . . or (4) the legal representative of [such persons described above]." 28 U.S.C. § 1605A(c); see also Reed, 845 F. Supp. 2d at 215. As noted before, both Siamak and Baquer Namazi are U.S. nationals, see Am. Compl., ¶¶ 7, 9, 12, 15, so they both have a federal cause of action under the FSIA.

The Court may now proceed to the merits of Plaintiffs' claims under that Act.

D.    Liability Under § 1605A(c)

The cause of action provided by the FSIA "require[s] plaintiffs to prove a theory of liability under which defendants cause the requisite injury or death." Valore, 700 F. Supp. 2d at 73. Until recently, in cases proceeding under the FSIA's federal cause of action, courts in this district were split as to whether to collapse the § 1605A(a) jurisdictional analysis — which the reader will recall ensures that the plaintiff alleges "personal injury or death" from "torture" or "hostage taking" — with the § 1605A(c) inquiry into liability for that same personal injury or death. Compare, e.g., Est. of Hirschfield v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 137– 38 (D.D.C. 2018) (courts must analyze jurisdiction and liability separately to avoid making

13

federal common law), with Hekmati, 278 F. Supp. 3d at 163 (finding satisfaction of § 1605A(a) jurisdictional requirements establishes elements of § 1605A(c) liability).  The D.C. Circuit, however, weighed in last year on the side of consolidation.  See K.E.V.F. ex rel. Vickers v. Islamic Republic of Iran, 135 F.4th 988, 991 & n.4 (D.C. Cir. 2025).  First, it collapsed the two analyses itself, finding that the plaintiff "ha[d] satisfied" the FSIA's subject-matter-jurisdiction and cause-of-action criteria and that "[t]herefore, [the plaintiff] ha[d] established Iran's liability." Id. at 991.  Next, responding to the argument that this approach risks manufacturing federal common law, the Circuit explained, "The FSIA 'instructs federal judges to find the relevant law, not to make it.'  But that does not mean judges should search outside the statute when the relevant law is the statute's plain text.  To find that text is to find the law."  Id. at 991 n.4 (quoting Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003)).

Following that guidance, the Court concludes that because Plaintiffs have satisfied the elements of § 1605A(a) jurisdiction and the federal-cause-of-action requirements of § 1605A(c), they have simultaneously demonstrated that Iran is liable for personal injury under § 1605A(c). To be sure, under the less economical approach, the Court could show in greater detail that Plaintiffs have more than sufficiently alleged personal injuries including assault, battery, false imprisonment, and intentional infliction of emotional distress.  See Am. Compl., ¶¶ 113–21, 135–50; see also, e.g., Abedini, 422 F. Supp. 3d at 132–34 (finding assault, battery, false imprisonment, and intentional infliction of emotional distress where plaintiff was tortured and taken hostage in Evin Prison); Azadeh v. Gov't of Islamic Republic of Iran, 2018 WL 4232913, at *17 (D.D.C. Sept. 15, 2018) (same).  But it need not do so.  Either way, Iran is liable to Plaintiffs under the FSIA.

14

E.    Damages

The final component of the analysis is the least straightforward.  FSIA plaintiffs may seek "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  The Namazis seek all of the above, as well as post-judgment interest associated with those damages.  See Memo. at 18–19, 29–30.  The foregoing analysis establishes that Iran's actions were "reasonably certain" to have resulted in the personal injuries for which it is liable.  Fraenkel, 892 F.3d at 353 (quoting Hill, 383 F.3d at 684); see also Abedini, 422 F. Supp. 3d at 136 (finding reasonable certainty of injuries established by jurisdictional and liability analysis); Hekmati, 278 F. Supp. 3d at 163 (same).  What remains is to ascertain what a "reasonable estimate" looks like for each type of damages sought.  Fraenkel, 892 F.3d at 353 (quoting Hill, 383 F.3d at 684).

1.    *Economic Damages*

Past as well as future lost earnings are compensable economic damages under the FSIA.  Moradi, 77 F. Supp. 3d at 71.  Relative to other types of FSIA damages, "lost earnings are not hard to quantify," and plaintiffs must do so "with competent evidence."  Id.  "Establishing a reasonable estimate of lost earnings through persuasive expert analysis supported by sound factual bases has been deemed sufficient."  Rezaian v. Islamic Republic of Iran, 422 F. Supp. 3d 164, 181 (D.D.C. 2019); see also Reed, 845 F. Supp. 2d at 214 (accepting report by forensic economist).  "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert."  Roth, 78 F. Supp. 3d at 402.

Siamak alone seeks compensation for lost earnings and submits a report by forensic economists to support his claim.  See Memo. at 23–24; see generally ECF No. 19-6, Exh. 5

(Staller Rep.).  Before his arrest, Siamak, then roughly 43 years old, headed strategic planning for an energy company in the UAE and earned about $227,000 pretax in 2014 (the calendar year prior to his arrest).  See Am. Compl., ¶ 12, 14; Staller Rep. at 2, 7.  Recall, too, that Siamak, now 54, has not secured employment since his September 2023 release, and his sealed filings document the ongoing physical and psychological symptoms that explain why, despite his pertinacious efforts to find work.  See Siamak Decl., ¶ 64; see also ECF No. 20-1, Exh. C (physician describing medical impacts of Namazi's incarceration including psychological disorders) at ECF pp. 29–30; ECF No. 20-1, Exh. D (career coach describing efforts to secure employment and challenges faced) at ECF pp. 44–46.  These details also sufficiently support the experts' assumption that Siamak will not secure work at least through 2026 — and therefore his request for lost earnings from the date of his release until the beginning of 2027 at the earliest.  See Staller Rep. at 6; cf. Abedini, 422 F. Supp. 3d at 138 (records contradicted plaintiff's assertion of permanent inability to work and corresponding damages claim).

With this background, Siamak's experts model a range of scenarios for lost earnings since his arrest on October 13, 2015, by adjusting several variables (what his income would have been in 2015, when he will retire, and when beyond this year he will successfully land employment).  See Staller Rep. at 2–3, 7–10.  The resulting range runs roughly from $3.2 million to $4.9 million in total lost earnings.  See Memo. at 24; Staller Rep. at 7–10.

The report's authors are thorough in detailing the facts that ground their assumptions and diligent in presenting the full array of possible outcomes those assumptions produce.  They put no thumb on the scale as to any of the variables adjusted throughout the calculations, nor does Siamak himself.  The Court will therefore assume that each modeled outcome is equally likely (or, more precisely, that each starting-income and retirement-age scenario is equally likely, and

16

that each reemployment date scenario is also equally likely within a given model) and average their outcomes accordingly. Cf. Wang v. Islamic Republic of Iran, 2025 WL 785736, at *15 (D.D.C. Mar. 12, 2025) (lacking plaintiff's or experts' guidance, court assumed equal likelihood of four education-completion scenarios). The Court thus awards Siamak $3,986,142 in economic damages, which breaks down to $1,603,825 in lost earnings during captivity and $2,382,317 for post-captivity lost earnings.

2.      *Pain and Suffering*

It is impossible to quantify the pain and suffering that the Namazis experienced in Iran's most infamous prison. Courts in this district do their best, however, by applying a *per diem* formula, awarding $10,000 per day of imprisonment in hostage-taking cases. Abedini, 422 F. Supp. 3d at 136–37 (collecting cases applying same formula). Recent decisions involving imprisonment in Evin Prison in particular have continued to follow this formula. Id.; see also, e.g., Ghodstinat v. Islamic Republic of Iran, 2025 WL 2222768, at *7 (D.D.C. Aug. 5, 2025); Wang, 2025 WL 785736, at *2, *13; Shourd v. Islamic Republic of Iran, 2024 WL 4346330, at *1, *6 (D.D.C. Sept. 30, 2024). Both Plaintiffs seek the same: Siamak computes $29,830,000 from an asserted 2,983 days spent in captivity, and Baquer, $24,170,000 from an asserted 2,417. See Memo. at 22–23. The Court finds no reason to deviate from the general formula but applies it in a different manner.

Based on the dates provided, the Court calculates that Siamak was held in Evin for 2,902 days (between October 13, 2015, and September 22, 2023) and that Baquer was held there for 694 days (between February 22, 2016, and January 15, 2018). See Am. Compl., ¶¶ 8–9, 77, 82; Siamak Decl., ¶ 23; Baquer Decl., ¶¶ 27–28, 34. Siamak spent roughly three months prior to his imprisonment under constant interrogation, and Baquer was held in Iran — but not in prison —

17

between his release from Evin and his flight to Oman in 2022. See Am. Compl., ¶¶ 21, 25, 33, 77–78. In Ghodstinat, a court in this district recently noted that not all limitations on liberty are equal and so applied the $10,000 *per diem* rate to days of imprisonment and a $3,500 *per diem* rate for days in which certain plaintiffs were under house arrest yet subjected to routine summonses and spying. See 2025 WL 2222768, at *7 (deeming house arrest "much less grueling than imprisonment"); see also Abedini, 422 F. Supp. 3d at 136–37 (applying $10,000 *per diem* to "1,268-day imprisonment") (emphasis added); Hekmati, 278 F. Supp. 3d at 163–64 (same); Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 123, 135 (D.D.C. 2005) (same). Avoiding harsh formalism, however, Ghodstinat equated pre-imprisonment days involving substantial interrogation with days of imprisonment, applying the $10,000 *per diem* there, too. See 2025 WL 2222768, at *7. This Court will follow that flexible approach and apply the same *per diem* rate to the 87 days between Siamak's arrest at the airport (July 18, 2015) and his incarceration at Evin (October 13, 2015) given the frequent and unpredictable interrogations he faced throughout this period. See Am. Compl., ¶¶ 8, 25–32. It will not, however, apply the same figure to the days Baquer spent trapped in Iran after his release from prison, despite the undeniable pain he endured as a result of his untreated medical conditions, applying instead a $3,500 *per diem* rate to that period. Id., ¶¶ 77–78; see also Baquer Decl., ¶¶ 35–36 (subject to weekly reporting to prison officials after release).

For their pain and suffering in captivity the Court will therefore award $29,890,000 to Siamak and $12,974,000 to Baquer.

The pain and suffering that tortured prisoners experience, however, do not end with their release. Even so, estimating post-captivity pain-and-suffering damages is less formulaic. Abedini, 422 F. Supp. 3d at 137. Courts consider "the victim's age at the time of release (the

18

length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering)."  Hekmati, 278 F. Supp. 3d at 164.  Plaintiffs seek $10 million each, pointing to three similar cases.  See Memo. at 23 (referencing Hekmati, 278 F. Supp. 3d at 164 ($10 million in post-captivity pain-and-suffering damages); Rezaian, 422 F. Supp. 3d at 180 (same); Wang, 2025 WL 785736, at *14 ($7.5 million)).

Courts in this district have also tended to use Hekmati's $10 million as a starting point, adjusting upward or downward by assessing the two factors that decision emphasized — viz., age at release and extent of long-term injury.  See, e.g., Ghodstinat, 2025 WL 2222768, at *8 ("[p]rorating from Hekmati's $10,000,000 baseline").  Courts considering similar abuse in Evin Prison have discerned no reason to diverge from Hekmati on the second factor, and neither does this Court.  See Rezaian, 422 F. Supp. 3d at 180; Abedini, 422 F. Supp. 3d at 137; Azadeh, 2018 WL 4232913, at *20.  But the Court will also follow those decisions by adjusting damages based on the first factor, in accordance with life expectancy.  See Ghodstinat, 2025 WL 2222768, at *8 (adjusting Hekmati's $10 million award for victim with life expectancy of 45 years down to $2,444,444 for plaintiff with life expectancy of 11 years); Abedini, 422 F. Supp. 3d at 137 (pro-rating to $9,630,000 for 43.2-year life expectancy); Azadeh, 2018 WL 4232913, at *20 ($8,888,889 for 40-year life expectancy).  Applying this unfortunately grim approach, the Court awards $7,400,000 to Siamak, who was roughly 52 upon release from Evin (statistical life expectancy of 33.3 years), and $1,644,444 to Baquer, who was 85 when he left Iran (7.4 years), for pain suffered after their captivity.  See Am. Compl., ¶ 12, 78; United States Life Tables 2023, 74 Nat'l Vital Stats. Reps., no. 6, at 34–35 (2023).  This brings total damages for pain and suffering to $37,290,000 and $14,618,444 for Siamak and Baquer, respectively.

3.      *Solatium*

In FSIA cases dealing with torture and hostage taking, courts have imported a modified version of the framework in Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006), a terrorism-related FSIA case, for awarding solatium damages to survivors' family members as follows: $4 million for spouses, $2.5 million for parents and children, and $1.25 million for siblings.  Id. at 271–359; Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011); see also Abedini, 422 F. Supp. 3d at 139–40 (following Heiser benchmarks); Reed, 845 F. Supp. 2d at 214 (same).  Courts are also free to depart from those benchmarks, considering "(1) whether family members had an extraordinarily close relationship to the victim; (2) whether the family member's emotional trauma was particularly severe; and (3) whether the circumstances of the attack made the suffering particularly agonizing for the family."  Abedini, 422 F. Supp. 3d at 140 (cleaned up and citations omitted).

Plaintiffs propose awards of $2.5 million each in solatium damages — for Siamak as the son of a victim and for Baquer as a victim's father.  See Memo. at 27.  They also seek upward adjustments because "they had increased emotional distress as they experienced the torture of concern regarding each other's well-being."  Id. at 28.  Plaintiffs cite no cases in which victims were imprisoned together and sought mutual solatium damages.  The fact that Plaintiffs are already recovering their own substantive damages based on their own imprisonment may make downward departure appropriate.  Iran did, on the other hand, weaponize each victim's suffering against the other, militating in favor of upward departure.  See Am. Compl., ¶ 68; Baquer Decl., ¶ 34 ("The authorities spread false reports to each of us about the other's health — telling Siamak that I was dying and telling me that he was being tortured — to break our spirits and extract false confessions.").  The Court will therefore land back in the middle and follow the

20

Heiser benchmarks without augmentation, allocating father and son $2.5 million each in solatium damages.

### 4. *Punitive Damages*

In addition to the foregoing compensatory damages, Plaintiffs seek punitive damages of $300 million — *i.e.*, $150 million for each victim. See Memo. at 29. Punitive damages "are awarded not to compensate the victims, but to 'punish outrageous behavior and deter such outrageous conduct in the future.'" Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (quoting Kim v. Democratic People's Republic of Korea, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)). To determine whether punitive damages under the FSIA are appropriate, courts consider "the character of the defendant's act; the nature and extent of harm to [the] plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998). Courts have repeatedly found that the torture of Americans in Evin Prison is well worth the imposition of substantial punitive damages under these factors. See, e.g., Rezaian, 422 F. Supp. 3d at 183–84; Abedini, 422 F. Supp. 3d at 140–42; Hekmati, 278 F. Supp. 3d at 166–67.

Several methods for calculating punitive damages have emerged in FSIA cases — namely, applying a court-determined multiplier to the defendant state's annual terrorism expenditures; awarding a $150 million lump sum per affected family; and matching total compensatory damages (sometimes with a court-determined multiplier). See Wang, 2025 WL 785736, at *16; Rezaian, 422 F. Supp. 3d at 183. The first method has fallen into some disfavor, particularly in detention cases with a small number of plaintiffs. See Rezaian, 422 F. Supp. 3d at 183 (explaining more common use in "case[s] of exceptionally deadly attacks") (quoting Braun, 228 F. Supp. 3d at 87); Abedini, 422 F. Supp. 3d at 141–42 (deeming method "excessive" due in

part to changes in scale of underlying state expenditures).  Plaintiffs here invoke the second method by pointing to Rezaian but double the resulting damages figure, seemingly understanding this method to apply per victim rather than per family.  See Memo. at 29; cf. Rezaian, 422 F. Supp. 3d at 184 (applied per family).

Courts have trended toward using the third method, which links punitive-damages awards to compensatory-damages totals.  See e.g., Tajbakhsh v. Islamic Republic of Iran, 2025 WL 2635648, at *14–15 (D.D.C. Aug. 12, 2025); Ghodstinat, 2025 WL 2222768, at *12; Wang, 2025 WL 785736, at *16 (declining to extend Rezaian to all cases involving prisoner swaps); Saharkhiz v. Islamic Republic of Iran, 2023 WL 9196605, at *21–22 (D.D.C. Oct. 16, 2023); Kar v. Islamic Republic of Iran, 2022 WL 4598671, at *22 (D.D.C. Sept. 30, 2022); but see Shourd, 2024 WL 4346330, at *8 (applying second method).  This approach has the advantage over the second method of allowing for judicial "discretion to tailor a punitive award appropriate to the magnitude of the underlying injury."  Abedini, 422 F. Supp. 3d at 142.  These decisions have also tended to match rather than multiply compensatory damages, absent a "special circumstance."  Id. (citing Davis v. Islamic Republic of Iran, 822 F. Supp. 2d 7, 17 (D.D.C. 2012) (hundreds of plaintiffs sued over Beirut bombing)).  The Court therefore awards punitive damages of $43,776,142 to Siamak and $17,118,444 to Baquer, equaling their respective compensatory-damages awards.

### 5.    *Post-Judgment Interest*

Finally, Plaintiffs request post-judgment interest.  They are entitled to it.  Congress has provided that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  Applying this statute "is mandatory, not discretionary."  Winternitz v. Syrian Arab Republic, 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (quoting

22

Schooley v. Islamic Republic of Iran, 2019 WL 2717888, at \*79 (D.D.C. June 27, 2019)); see also Wang, 2025 WL 785736, at \*17 (awarding post-judgment interest as mandatory application of statute). This interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment," 28 U.S.C. § 1961(a), and it "shall be computed daily to the date of payment . . . and . . . compounded annually." 28 U.S.C. § 1961(b). The Court accordingly grants Plaintiffs' request for post-judgment interest to be paid at the statutory rate.

*    *    *

In total, the Court will award $121,789,173 in damages to Plaintiffs, in addition to post-judgment interest, as follows:

| Plaintiff | Economic damages | Pain and suffering | Solatium | Punitive | Total |
|---|---|---|---|---|---|
| Siamak Namazi | $3,986,142 | $37,290,000 | $2,500,000 | $43,776,142 | **$87,552,284** |
| Baquer Namazi | $0 | $14,618,444 | $2,500,000 | $17,118,444 | **$34,236,889** |
| Total | $3,986,142 | $52,441,778 | $5,000,000 | $60,894,586 | **$121,789,173** |

## IV.    Conclusion

For these reasons, the Court will enter default judgment for Plaintiffs in the amounts listed above, along with post-judgment interest on those amounts. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: July 7, 2026